* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. All parties are properly before the Commission, and this is the Court of proper jurisdiction for this action.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On the alleged date of injury, the parties were subject to, and bound by, the provisions of the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. Wake County is self-insured for this risk, utilizing Corporate Claims Adjusting, Ltd., as Third Party Administrator.
6. Plaintiff's alleged date of injury is October 14, 2002.
7. Plaintiff contends that he completed a written Injury Report for the alleged work injury of October 14, 2002 and that he submitted same to the Employer. The Risk Management Department of Defendant Wake County contends that it does not have a record of any such written Injury Report by Plaintiff for the alleged work injury of October 14, 2002.
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 56 years old. He began working with defendant as a paramedic in 1976 and continued working exclusively in that capacity until his disability retirement on April 1, 2003. *Page 3 
2. Plaintiff's job duties as a paramedic often required strenuous physical exertion and heavy lifting. On emergency calls, plaintiff had to carry equipment that weighed well over 100 pounds, and he often had to assist in lifting very heavy patients on stretchers.
3. Prior to October 14, 2002, plaintiff had sustained several work injuries while working with defendant for which he received workers' compensation. On each of these occasions, plaintiff notified defendant of the incident, and defendant provided appropriate medical treatment under the Workers' Compensation Act. In January of 1996, plaintiff sustained a work-related injury to his low back; he received a series of spinal blocks through August of 1996 and eventually underwent spinal surgery at the L5-S1 level.
4. Between May of 1998 and September 13, 2002, plaintiff presented to his primary care physician, Dr. Musselman, on at least seven separate occasions with complaints of back pain. For instance, in July of 1998, plaintiff's back pain was so severe that Dr. Musselman prescribed a Medrol Dosepak and ordered an MRI, which showed the old L5-S1 injury but no recurrent herniation.
5. On September 13, 2002, which was about one month before plaintiff's alleged date of injury in this claim, plaintiff presented to Dr. Musselman with complaints of pain in his hips and low back. Again, the pain was severe enough for Dr. Musselman to prescribe a Medrol Dosepak.
6. On October 1, 2002, which was about two weeks before plaintiff's alleged date of injury in this claim, plaintiff presented to Dr. Callaway, an orthopedic surgeon, complaining of left hip pain that had been going on for about two weeks. Dr. Callaway placed plaintiff on light duty at work and recommended that plaintiff use crutches to keep weight off his left leg. *Page 4 
7. Plaintiff testified that he sustained a low back injury during a work shift that began at about 8 a.m. on October 14, 2002 and ended at 8 a.m. the next day. He testified that he came to work the morning of October 14, 2002 feeling perfectly fine. Initially plaintiff testified that it was after the second call of the shift, or after 1 p.m., that he started having severe back pain. However, plaintiff later testified that he could not pinpoint when he started having the back pain, but rather that he had worked the entire 24-hour shift with his back hurting.
8. Plaintiff testified that he filled out an accident report detailing the onset of his back pain on October 14, 2002, and that he put the report in the box at the station for the B-shift supervisor, Glen Barham. Mr. Barham had no recollection of ever seeing the report. Carolyn Watson, a risk management specialist with defendant since September of 2001, could not find any record of plaintiff having reported his alleged back injury. Plaintiff, who testified that he is a stickler for paperwork, did not keep a copy of the accident report, although, he admitted, the station had a copying machine and he could have made a copy.
9. Plaintiff testified that, during his October 14, 2002 shift, he also called "downtown" and spoke with a supervisor (either Mr. Barham, Jerry Brown or Alan Foster) about his alleged back injury. Mr. Barham, Mr. Brown, nor Mr. Foster recalled ever having heard from plaintiff or anyone else that plaintiff was injured on or about October 14, 2002.
10. Plaintiff testified that, during the late-night portion of the October 14, 2002 shift, he was at the station sitting on a couch with his back hurting so bad that he had to prop his legs and back up with pillows. Plaintiff testified that Mr. Barham witnessed plaintiff being in pain in this manner, but Mr. Barham did not corroborate plaintiff's testimony.
11. Plaintiff's partner on the October 14, 2002 shift, Frank M. Kannon, signed a brief letter stating that, during said shift, plaintiff "began complaining of severe back pain." This *Page 5 
letter was dated October 12, 2005, three years after the alleged injury. Mr. Kannon testified that he does not remember the events of October 14, 2002 specifically and that plaintiff had complained to him of back pain many times over the years between 1996 and October of 2002. Mr. Kannon further testified that defendant had a policy in which an injured employee could request relief from his or her shift but that he did not recall plaintiff requesting relief from his shift on October 14, 2002 despite allegedly suffering from severe back pain.
12. Plaintiff testified that the pain he developed on October 14, 2002 was severe sharp back pain that radiated into his left leg and that these symptoms were "100 percent different" from the left hip pain for which he had been seeing Dr. Callaway earlier in the month.
13. Plaintiff saw Dr. Callaway's assistant on October 16, 2002. The record of this visit shows only that it was a follow-up for plaintiff's left hip pain, and there is no mention whatsoever of any back pain, left leg symptoms or any incident having occurred on October 14.
14. Plaintiff returned to Dr. Callaway's office on October 22, 2002, and the record again shows no mention of back pain or any October 14 incident. The physical examination showed "actually . . . fairly good range of motion of his lumbar spine without any significant pain."
15. After an October 30, 2002 MRI showed degenerative changes with a large left paracentral disc herniation at L5-S1, plaintiff underwent surgery on October 31, 2002 with Dr. St. Clair, who performed a re-exploration of plaintiff's old surgical site at L5-S1. The post-operative diagnosis was a recurrent disc herniation with lumbar radiculopathy.
16. As to why he did not mention his back pain or the alleged October 14, 2002 injury at his October 16, 2002 appointment or thereafter, plaintiff testified that he was only thinking about getting back to work because he could not afford to be out of work. However, plaintiff *Page 6 
admitted that he had not hesitated to tell his physicians that his back injury in 1996 and his wrist injury in 2000 were work-related.
17. Plaintiff did not contact defendant for pre-authorization of the October 31, 2002 surgery under workers' compensation, nor did he contact them for workers' compensation coverage thereafter, even when he was being pursued by bill collectors for the portions of the bills that were not covered by his general health insurance. Plaintiff admitted that defendant had paid all the medical bills associated with his earlier workers' compensation claims and that, had any providers pursued him for collections on those bills, he would have notified defendant.
18. Plaintiff returned to work after his October 31, 2002 surgery and worked light duty until retiring on disability on April 1, 2003. Plaintiff's resignation letter, dated March 10, 2003, states, in relevant part, "As you are aware, I have been on light duty with EMS since October 14th, 2002, due to back problems. I had repeat back surgery on October 31st, 2002, on discs L5 and S1, the same as I had in August 1996." The letter makes no mention of a workers' compensation claim or of any specific traumatic incident on October 14, 2002. Asked why plaintiff did not mention any alleged work-relatedness of his back problems in his resignation letter, plaintiff simply stated he did not know.
19. Plaintiff went on receiving medical treatment for his low back problems from Drs. Musselman, St. Clair and Nelson, eventually undergoing a fusion at L5-S1 on March 12, 2004 with Drs. St. Clair and Nelson. Plaintiff never mentioned any alleged incident on October 14, 2002 to any of his providers or contended to any of them that his back problems after that date were work-related. Further, plaintiff failed to obtain pre-authorization from defendant to undergo the March 12, 2004 surgery. *Page 7 
20. As with his October 31, 2002 surgery, plaintiff's March 12, 2004 surgery was covered by his general health insurance, and plaintiff made substantial payments out-of-pocket without notifying defendant.
21. Plaintiff admitted that he knew from his prior workers' compensation claims that defendant requires pre-authorization for any major medical procedure.
22. Plaintiff filed a Form 18 on or about September 28, 2004. Defendant filed a Form 19 shortly thereafter stating that their first notice of plaintiff's claim came on September 28, 2004.
23. Dr. Musselman is a family practitioner with no specialized training in back injuries. He did not see plaintiff in October of 2002. He did not recall plaintiff ever telling him that he had hurt his back at work in October of 2002, although he testified that plaintiff is a good historian. Nonetheless, Dr. Musselman testified, apparently based on the October 30, 2002 MRI finding, that "something happened" on October 14, 2002 and that, but for this "incident," plaintiff would not have needed his October 31, 2002 surgery.
24. Dr. Musselman further testified that plaintiff's job duties over the course of his career with defendant significantly contributed to the development of his low back condition and that his job put plaintiff at an increased risk, over that faced by the general public, of his suffering a low back injury.
25. Dr. Callaway is a board-certified orthopedic surgeon. As he testified, assuming plaintiff sustained a specific traumatic incident to his low back on October 14, 2002, then the incident aggravated plaintiff's pre-existing low back condition. As Dr. Callaway further testified, plaintiff's job duties significantly contributed to the development of his low back condition, and paramedics are at risk for back injuries to a higher degree than most people. *Page 8 
However, as Dr. Callaway testified, he was not aware that plaintiff was alleging an October 14, 2002 work-related back injury until he was so informed immediately before his deposition.
26. Dr. St. Clair is a board-certified neurosurgeon. He, too, was not aware that plaintiff was alleging an October 14, 2002 work-related back injury until he was so informed immediately before his deposition. As Dr. St. Clair also testified, assuming plaintiff sustained a specific traumatic incident to his low back on October 14, 2002, then the incident aggravated plaintiff's pre-existing low back condition. As Dr. St. Clair further testified, plaintiff's job probably put him at an increased risk of injuring his back, but it did not significantly contribute to plaintiff's development of degenerative disc disease.
27. Dr. Nelson is a board-certified orthopedic surgeon. He, too, was not aware that plaintiff was alleging an October 14, 2002 work-related back injury until he was so informed immediately before his deposition. As Dr. Nelson testified, it is more likely that plaintiff's low back condition has been caused by an atraumatic degenerative process rather than his job duties.
28. Plaintiff has never been informed by any medical provider that his degenerative disc disease, in and of itself, is work-related. There is no competent, credible evidence in the record that plaintiff's job duties with defendant placed him at an increased risk, over that faced by the general public, of developing degenerative disc disease.
29. Taking into consideration plaintiff's inconsistent testimony regarding the incident, his failure to explain that the injury was work-related to any medical provider even after receiving bills for service, his knowledge of the workers' compensation system gained from prior injuries, and the testimony of other witnesses who could not corroborate plaintiff's testimony, the Full Commission finds plaintiff's testimony not credible. *Page 9 
30. By the greater weight of the competent, credible evidence of record and reasonable inferences therefrom, the undersigned find that plaintiff has not carried his burden of persuasion to show that he sustained a specific traumatic incident to his back on or about October 14, 2002.
31. By the greater weight of the competent, credible evidence of record and reasonable inferences therefrom, the undersigned also find that plaintiff has not carried his burden of persuasion to show that he gave written notice of the alleged October 14, 2002 incident to defendant, that defendant had actual knowledge of said alleged incident, and/or that he had a reasonable excuse for not giving written notice to defendant.
32. The undersigned also find that defendant was prejudiced by not receiving timely notice of plaintiff's workers' compensation claim, in that they were unable to investigate plaintiff's claim in a prompt fashion and lost their right to direct plaintiff's significant medical treatment in a reasonable fashion.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of and in the course of employment. Injury by accident is construed to include any disabling physical injury to the back if it arises out of and in the course of employment and is the direct result of a specific traumatic incident of the work assigned. N.C. Gen. Stat. § 97-2(6). The person claiming the benefit of compensation has the burden of showing that the injury complained of resulted from an injury by accident arising out *Page 10 
of and in the course of employment. Henry v. A.C. Lawrence LeatherCo., 231 N.C. 477, 57 S.E.2d 760 (1950). In the case at hand, plaintiff has failed to show through competent, credible evidence that the injury resulted from an injury by accident arising out of and in the course of his employment.
2. Plaintiff has failed to meet his burden to show that he contracted a compensable occupational disease in his employment with defendant. The expert medical testimony does suggest that there is a causal connection between plaintiff's job duties and his current low back condition. However, the expert medical testimony only establishes that plaintiff's job placed him at an increased risk of injuring his low back, not of developing degenerative disc disease. The expert medical testimony does not support a conclusion that plaintiff's degenerative disc disease is not an ordinary disease of life to which the public is equally exposed. Further, to the extent that plaintiff contends that his current condition is compensable because his job duties aggravated or accelerated his pre-existing back condition, his claim fails because he has not shown that his job placed him at an increased risk of developing the pre-existing back condition itself, namely degenerative disc disease. N.C. Gen. Stat. § 97-53(13); Futrell v. Resinall Corp., 151 N.C. App. 456 (2002), aff'dper curiam, 357 N.C. 158 (2003).
3. Because plaintiff has failed to show that he sustained a specific traumatic incident to his back in the course of and arising out of his employment with defendant on or about October 14, 2002, and further because plaintiff has failed to show that he contracted a compensable occupational disease, he is not entitled to any compensation under the Workers' Compensation Act. N.C. Gen. Stat. §§ 97-2(6) and 97-53.
4. Plaintiff has failed to show that he provided written notice to defendant within 30 days of the occurrence of the alleged October 14, 2002 incident or that defendant had actual *Page 11 
knowledge of such incident, and/or that he had a reasonable excuse for not giving written notice. Defendant was prejudiced by this failure to provide notice and, therefore, plaintiff is not entitled to any compensation for the alleged October 14, 2002 incident. N.C. Gen. Stat. § 97-22.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 ORDER
1. Plaintiff's claim for a specific traumatic incident to his low back on or about October 14, 2002 is hereby denied.
2. Plaintiff's claim for an occupational disease is hereby denied.
3. Each side shall bear its own costs. If not already paid, defendant shall pay an expert witness fee of $742.50, or the amount actually billed, whichever is less, to Dr. Musselman.
This the 27th day of August, 2007.
S/______________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ BUCK LATTIMORE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1